Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> DALE T. JABOUR, KENNETH COCHRANE, STEVEN SHANKLIN, DAVID JONES; and DOES 1-10, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 and 1365, *et seq*.

## I.    INTRODUCTION

1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants DALE T. JABOUR, JAMES J. BOLTINGHOUSE, KENNETH COCHRANE, STEVEN SHANKLIN and DAVID JONES ("Defendants") for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

**Notice Letter**

2.      On or about August 5, 2025, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of Plaintiff's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.

5.      Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.      This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II.  PARTIES

**Plaintiff**

7.      Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS is an environmental membership group organized under the laws of the State of California.

**Defendants**

8.      Sweetener Products, Inc, doing business as Sweetener Products Co, is a California corporation in good standing with the California Secretary of State.

9.      Sweetener Products, Inc. operates two facilities in California which manufacture sweeteners and food additives.  One of the facilities is located at 2050 E. 38th Street in Vernon, California; and the other is located at 1150 Thurman Street in Lodi, California.

10.    Both of Sweetener Products Inc.'s facilities are industrial facilities subject to California's Industrial General Permit and are required to maintain ongoing, continuous Permit coverage.

11.    Sweetener Products Co is identified in the Water Board's records as the Industrial General Permit applicant/permittee and operator of the Lodi facility which is the subject of this complaint  ("Sweetener's Lodi facility" or "the Facility").

12.    Defendant DALE T. JABOUR is the Chief Executive Officer of Sweetener Products, Inc.

13.    Defendant KENNETH COCHRANE is the Plant Manager for Sweetener's Lodi facility and is also a duly authorized representative of Sweetener Products, Inc. for purposes of General Permit compliance at the Facility.

14.    Defendant STEVE SHANKLIN is the Vice President of Operations for Sweetener Products, Inc. and is also the legally responsible person of Sweetener Products, Inc. for purposes of General Permit compliance at the Facility.

15.    Defendant DAVID JONES is the Maintenance Manager for Sweetener's Lodi facility and is also a duly authorized representative of Sweetener Products, Inc. for purposes of General Permit compliance at the Facility.

16.    All Defendants personally participated in the commission of the violations of the CWA and General Permit as alleged herein, including conspiring with each other and with third parties to commit criminal fraud.

### III.  JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

18.     Venue is proper because all Defendants reside in California, and the events or omissions giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the CWA violations committed by Defendants have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## IV.   ARTICLE III STANDING

19.     Plaintiff is an environmental membership organization with active voluntary associational members who reside in northern California, as confirmed by documents on file with the California Secretary of State.

20.     Plaintiff has multiple identifiable associational members in northern California, as confirmed by public records.

21.     Plaintiff's status as a sole managing member limited liability company (as opposed to a non-profit corporation) is irrelevant to whether it has standing to bring this suit and is not dispositive of its ability to maintain its active associational members.

22.     Plaintiff's organizational purpose and mission is the protection, preservation and enhancement of the navigable rivers, lakes and oceans (and their tributaries) physically located in northern California.

23.     Plaintiff's organizational purpose and mission is accomplished through enforcement of the provisions of the CWA and California's Industrial General Permit, by seeking redress against industrial businesses located in northern California who violate the CWA and fail to comply with all standard conditions of California's Industrial General NPDES Permit ("General Permit").

24.     The filing of this complaint is germane to Plaintiff's organizational purpose and mission.

25.     Violations of the standard conditions of the General Permit are actionable by citizens under the CWA pursuant to 33 U.S.C. section 1365(f)(7).

26.     A subset of EDEN's current and identifiable associational members reside, work and/or recreate near the Mokelumne River, a permanent, continuously flowing body of water

which is also a navigable Water of the United States that is part of the Sacramento-San Joaquin River Delta ("the affected waterways"), and use those waters and their watersheds for kayaking, canoeing, cycling, recreation, sportfishing, swimming, hiking, bird watching, photography and nature walks. Their use and enjoyment of the affected waterways has been and continues to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA.

27.    A subset of EDEN's current and identifiable associational members described above are all persons for whom the aesthetic and recreational value of the affected waterways has been diminished and/or impaired on an ongoing and continuous basis as a direct result of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

28.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who are aware of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

29.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who believe that Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein, have directly contributed to (a) degradation of the affected waterways downstream from the Facility; (b) injury to, deformation and toxicity of the aquatic life in the affected waterways; and (c) a reduction in the number of birds and other wildlife existing in the area.

30.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who intend to return to the affected waterways to recreate, albeit with a diminished desire and aesthetic enjoyment, directly attributable to Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

31.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who no longer wish to immerse any part of their body in

the portion of the affected waterways downstream from Defendants' facility because of their awareness of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility as described herein, their belief that Defendants' ongoing violations proximately caused or contributed to degradation of water quality in the affected waterways since at least September 1, 2020, and continuing to the present, and concerns over potential adverse health effects caused by bodily contact with the affected waterways.

32.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who no longer wish to consume any fish caught from the affected waterways because of their awareness of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein, their belief that Defendants' ongoing violations proximately caused or contributed to degradation of the affected waterways since at least September 1, 2020, and continuing to the present, and concerns over potential adverse health effects of consuming fish caught from the affected waterways.

33.    A subset of Plaintiff's current and identifiable associational members described in the paragraphs above are all persons who have experienced informational injuries directly resulting from Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, since at least September 1, 2020, and continuing to the present, as described herein.

34.    The informational injuries sustained by Plaintiff's current and identifiable associational members as described in the paragraphs above constitute a deprivation of the rights of the referenced persons to obtain complete and accurate information regarding Defendants' compliance with standard conditions of the General Permit at the Facility, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

35.    One of the most important standard conditions of the General Permit is monitoring and reporting, which is comprised of multiple separate requirements.

36.     The first step requires industrial businesses covered by the General Permit ("Permittees") identify in their Storm Water Pollution Prevention Plan ("SWPPP") all industrial materials and chemicals present at their facility.  For each industrial material/chemical identified, the Permittee is required to designate an indicator parameter as an additional sampling parameter if the material in question has any potential to commingle with storm water.  This ensures that Permittees are testing their storm water for all potential constituents likely to be present in their storm water runoff.

37.     The next step is to designate locations for collecting storm water samples which are representative of industrial activity.  This means that a Permittee must collect storm water samples from areas of their facility that are likely to show the presence of industrial materials and chemicals from outdoor industrial activities conducted by the Permittee.

38.     The General Permit requires Permittees to segregate their facility into separate drainage areas, defined by the direction of storm water flowing to a common area.  Storm water encompasses both surface flow (above ground) and precipitation falling on the facility that enters drain inlets and flows through underground conveyances.  Drainage areas are also dependent on the layout of facility in terms of the location of buildings, structures, ground elevations, grading and storm water conveyances.

39.     The Permittee is then required to designate at least one representative storm water sampling location for each of the segregated drainage areas.

40.     Defendants handle numerous types of chemicals and industrial materials at the Facility which are associated with the following toxic substances:  Sulfites, Ammonia, Nitrates, Chemical Oxygen Demand (COD), Biochemical Oxygen Demand (BOD), Iron, Zinc, Volatile Organic Compounds (VOCs) and Total Petroleum Hydrocarbons (TPH).

41.     As described in this complaint and the attached Notice, to date Defendants have not yet conducted an adequate sampling parameter assessment for the Facility and have not segregated the Facility into separate drainage areas and depicted those drainage areas on the Facility's Site Map.

42.    Since September 1, 2020, and continuing to the present, Defendants have not collected storm water from all required areas of the Facility and have not tested the Facility's storm water for all required sampling parameters.

43.    In addition, Defendants' housekeeping practices at the Facility are deficient on an ongoing and continuous basis and include allowing toxic chemicals and industrial materials to enter onsite storm drains which flow into the affected waterways; failing to clean up spills of toxic industrial materials; maintaining uncovered waste bins; significant excess outdoor storage of scrap and industrial materials, and significant staining on the ground from industrial materials and chemicals, as well as other deficiencies which are detailed in the attached Notice.

44.    Another standard condition of the General Permit is that all Permittees must upload to the SMARTS publicly accessible database system all storm water sampling analytical data, SWPPPs and Site Maps, Annual Reports and other required documents.

45.    The purpose of this requirement is to allow the general public to assist the regulatory agencies with monitoring Permittees' compliance with the standard conditions of the General Permit.

46.    The General Permit also requires Permittees to certify under penalty of law that every document uploaded to SMARTS is true, correct and complete.

47.    Defendants have uploaded and certified documents to SMARTS which contain objectively false information, including Annual Reports which provide false explanations for Defendants' failure to collect storm water samples at the Facility; and false and deficient SWPPPs which include objectively false information related to drainage, storm water flow, drain inlets, mandatory sampling locations, industrial materials handled at the Facility, and storm water flow/sampling locations.

48.    As a result of Defendants' intentional misrepresentations as articulated above, Defendants have since September 1, 2020, and continuing to the present, avoided their mandatory responsibility pursuant to the CWA and General Permit of testing the Facility's storm

water for all industrial materials and chemicals handled at the Facility which could potentially come into contact with storm water, in violation of the standard conditions of the General Permit.

49. As a result of Defendants' intentional misrepresentations as articulated above, Defendants have since September 1, 2020, and continuing to the present, avoided their mandatory responsibility pursuant to the CWA and General Permit of collecting storm water from all required sampling locations present at the Facility, in violation of the standard conditions of the General Permit.

50. Defendants' failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's associational members referred to in the paragraphs above from: (a) accessing on SMARTS the true operational facts relevant to the Facility; and (b) acquiring accurate and complete data related to the unmonitored substances emanating from the Facility during rain events.

51. As such, Plaintiff's current and identifiable associational members referred to in the paragraphs above are unable to fully assess the extent of the General Permit violations at the facility, as well as the types and levels of industrial materials entering the affected waterways, due to Defendants' willful violations of the standard conditions of the General Permit at the Facility; or to gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

52. The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above have been members of EDEN since at least the date of Plaintiff's Notice to Defendants.

53. The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are individuals who have all experienced an ongoing, continuous, concrete, personal, specific, actual or imminent, non-speculative injury-in-fact commencing on and after September 1, 2020, and continuing to the present, arising directly from Defendants' failure to comply with the standard conditions of the General Permit at the Facility, as articulated herein.

54.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who would have standing to file this suit by themselves as individual plaintiffs.

55.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs  above are all persons who will not be required to personally participate in this lawsuit, except for the member(s) who have agreed to be identified for purposes of standing. Plaintiff will disclose the identities of those member(s) to Defendants in Plaintiff's Initial Disclosures, pursuant to the requirements of Federal Rule of Civil Procedure 26.

56.     The ongoing and continuous injuries sustained by the subset of EDEN's current and identifiable associational members described in the foregoing paragraphs will be adequately redressed by a judicial decision in this matter granting Plaintiff the injunctive relief requested herein.

57.     Defendants do not need to know the identity of any of Plaintiff's current and identifiable associational members described in the paragraphs above to understand and respond to this Complaint.

## V.  **STATUTORY BACKGROUND**

58.     Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

59.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Permittees or through the issuance of a single, statewide general permit applicable to all industrial storm water Permittees. 33 U.S.C. § 1342(p)

60.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

<u>Citizen Suit Provision of the CWA</u>

61.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of any standard condition of any NPDES Permit.

62.     No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

63.     By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

64.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation, for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

65.     Violations of the standard provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4

A.  **General Permit**

66.    The California Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)

67.    The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

68.    The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

69.    A complete copy of the current General Permit Order is accessible at https://www.waterboards.ca.gov/water_issues/programs/storm water/igp_20140057dwq.html

70.    All industrial facilities located in California having the potential to discharge storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing Permit Registration Documents, including a Permit Application, and an initial SWPPP and Site Map.

71.    The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

1.  **SMARTS Compliance Database**

72.    The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Permittees enter and manage storm water data associated with General Permit compliance.

73.     SMARTS is readily accessible by the general public on the web; and the system is maintained primarily for the purpose of providing public access to allow citizens to monitor Permittees' compliance with the General Permit and to pursue Permittees who fail to comply, utilizing the citizen's suit provision of the CWA.

74.     SMARTS can be accessed at California Stormwater Multiple Applications and Report Tracking System.

75.     The General Permit requires Permittees to certify (under penalty of law) and submit to SMARTS all Permit Registration Documents, including Permit Applications, SWPPPs and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual Reports.  General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L), Attachment D.

**2.    Standard Conditions of the General Permit**

76.     The General Permit contains a variety of substantive and procedural standard conditions.

77.     The General Permit requires that Permittees comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7).  General Permit § XXI(A)

78.     The primary standard conditions of the General Permit include the following:

(a)     Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b)     Implementing and maintaining *Best Management Practices* ("BMPs");

(c)     Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d)     Collecting and analyzing *storm water runoff samples* four times per year;

(e)    Collecting the *storm water samples during qualified storm events, from all required sampling locations, in all drainage areas* in places which are representative of industrial operations;

(f)    Testing the collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)    Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)    Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS; and

(j)    Establishing an onsite compliance Team of at least two employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit.

SWPPP and Site Map Requirements

79.    All Permittees are required to develop and implement a SWPPP.

80.    The main objective of the SWPPP requirement is to identify and evaluate sources of industrial materials and chemicals associated with industrial activities that may affect the quality of storm water runoff from the Permittee's facility, and to implement best management practices ("BMPs") to reduce or prevent materials associated with industrial activities in storm water runoff emanating from the Permittee's facility.  General Permit § X(C).

81.    To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days whenever the SWPPP requires significant revisions. General Permit § X(B)

82.    Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

83.    Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of an onsite compliance Team; a site

map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a discussion of whether industrial materials or chemicals have the potential to commingle with storm water;  a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent industrial materials in storm water runoff. General Permit §§ X(A)-X(I)

84.    The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table.  General Permit § X(H)(4), (5)

85.    Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water from the facility, locations of storm water collection and conveyance systems, associated sampling locations, locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas. General Permit § X(E)

Best Management Practices

86.    The General Permit requires all Permittees to implement and maintain the following minimum Best Management Practices: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping.   General Permit § X(H)(1)

87.    The General Permit further requires Permittees to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs if necessary: exposure

minimization BMPs, storm water containment BMPs, treatment control BMPs, and other advanced BMPs.  General Permit § X(H)(2)

88.     Failure to implement minimum and advanced BMPs as necessary is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

<u>Monitoring and Reporting/Storm Water Sampling and Analysis</u>

89.     The General Permit requires Permittees to develop and implement an adequate Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of industrial materials in a facility's storm water runoff to ensure compliance with the General Permit.

90.     As part of their monitoring program, Permittees must identify all required storm water sampling locations and evaluate the effectiveness of BMP .

91.     Section XI(B) of the General Permit requires that Permittees collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

92.     A QSE is a precipitation event that produces measurable precipitation for at least one drainage area and is preceded by 48 hours with no measurable precipitation in any drainage area.  General Permit §XI(B)(2)

93.     Once the storm water samples have been collected, the General Permit requires that Permittee's must deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §§ XI(B)(8), XI(B)(11)

94.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Permittee on a facility-specific basis.  General Permit § XI(B)(6)(c)

95.     Facilities are also required to conduct monthly and sampling event visual observations.   Monthly visual observations must be conducted during daylight hours on days without precipitation and must include observing each drainage area; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and monitoring BMPs for effectiveness.  Sampling event visual observations are conducted at the same time as sampling occurs and must include observing storm water runoff for the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris.  General Permit § XI(A)

<u>Annual Comprehensive Facility Evaluation</u>

96.     The General Permit requires Permittees to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit § XV

<u>Annual Reports</u>

97.     Section XVI(A) of the General Permit requires all Permittees to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

98.     Annual Reports are auto populated by SMARTS from Permittees' answers to a series of twelve questions, which require mostly yes/no responses.

99.     The questions include whether the Permittee has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all required sampling locations at its facility; and where the facility is located within an impaired watershed, the Permittee has assessed whether any of the receiving water impairments are present at their facility.

100.     Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

Certification of Compliance Documents

101.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## VI.    SPECIFIC FACTUAL ALLEGATIONS

### A.    The Facility

102.    Sweetener's Lodi Facility falls under standard industrial classification ("SIC") code 2064-Candy and Confectionery mfg, based on public records.

103.    SIC Code 2064 is included in Attachment A of the General Permit as a type of industrial operation that requires application for and receipt of General Permit coverage.

104.    Based on the foregoing, Plaintiff alleges that the Facility is required to maintain standard General Permit coverage and is not eligible to apply for or receive either No Exposure Certification (NEC coverage) or Notice of Non-Applicability (NONA coverage).

### C.    Defendants' General Permit Violations

Deficient SWPPP/Failure to Follow SWPPP

105.    Since at least September 1, 2020, Defendants have failed to implement an adequate SWPPP for the Facility and have failed to comply with the terms of the Facility's deficient SWPPP, in violation of the standard conditions of the General Permit.   General Permit §§ I(J), II(A)(1), II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

106.    Defendants' continuing failure to implement and follow an adequate SWPPP is evidenced by documents uploaded and certified to SMARTS under penalty of law by Sweetener Products, as well as by required documents which have not been uploaded to SMARTS.

107.    Defendants' continuing failure to implement an adequate SWPPP is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies.

108.    As is more particularly described in **Exhibit A**, attached hereto and incorporated herein by reference, Plaintiff's Notice issued to Defendants on August 5, 2025, delineates numerous deficiencies in Defendants' SWPPPs certified and submitted to SMARTS on January 26, 2022; August 3, 2022; and November 12, 2024; and Defendants' Site Maps certified and submitted to SMARTS on January 26, 2022; August 3, 2022; May 1, 2024; and November 12, 2024.

109.    Defendants' current SWPPP and Site Map contains misleading, false or insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; mandatory sampling points; the type, amount and location of industrial materials and chemicals handled at the Facility; and all mandatory required sampling parameters associated with the facility's industrial materials and chemicals.

110.    Defendants have failed and continue to fail to alter the Facility's SWPPP/Site Map and site-specific BMPs to comply with the requirements of the General Permit.

111.    In addition, Defendants have failed to comply with the provisions of the Facility's current SWPPP in the areas of monitoring and reporting.

112.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendants' deficient SWPPP/Site Map are ongoing and continuous.

Monitoring and Reporting/ Storm Water Sampling

113.    Plaintiff alleges that Defendants' monitoring and reporting program at the Facility is deficient and in violation of the mandatory standard conditions of the General Permit.  General Permit §§ X, X(I), XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii); 33 U.S.C. § 1365(f)(7)

114.    Defendants' deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

115.    Defendants' deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and government agencies, as well as other relevant documents maintained by Defendants and governmental and regulatory agencies.

116.    Since September 1, 2020, Defendants have failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

117.    Since September 1, 2020, Defendants have failed to conduct monthly visual observations at the Facility and complete and retain monthly observation reports which comply with Section XI.A of the General Permit, as is more particularly described in Plaintiff's Notice attached hereto as **Exhibit A**.

118.    Defendants have also collected samples of storm water at the Facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without precipitation, as is more particularly described in Plaintiff's Notice attached hereto as **Exhibit A**.

119.    Defendants have failed to collect storm water samples from each drainage area at all mandatory sampling locations at the Facility, for each QSE where sampling is performed, pursuant to General Permit § XI(B), as is more particularly described in the Notice attached hereto as **Exhibit A**.

120.    Defendants have failed to analyze the Facility's storm water samples for all required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

121.    Defendants have failed to deliver storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to Attachment H, Section 2 of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

122.    Defendants' monitoring and reporting violations are continuous and ongoing at the Facility.

Falsification of Annual Reports and SWPPPs/Site Maps

123.    Since September 1, 2020, Defendants have colluded and conspired with their attorneys and with their retained environmental consultants, including Jessica Stacy, John Balobeck and Jason Wuntschel of Network Environmental Solutions, Inc, to falsify information in the Facility's Annual Reports, SWPPPs and Site Maps for the purpose of avoiding their mandatory requirement of collecting storm water samples from all required areas of the Facility and testing all collected storm water samples for all mandatory constituents.  (See **Exhibit A**, attached hereto

124.    Since September 1, 2020, Defendants have intentionally submitted inaccurate and falsified Annual Reports and SWPPPs to the Water Board and general public via SMARTS, in violation of the standard conditions of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ II(A)(1), XI(A)(C), XVI, XXI(K), XXI(L), XXI(N); General Permit Fact Sheet § II(O); 33 U.S.C. § 1365(f)(7)

125.    Defendants' submission of false Annual Reports and SWPPPs and continuing failure to retract their false statements to the Water Board and the general public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants.

126.    Defendants' submission of false Annual Reports is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory

agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

127.    Defendants' submission of false statements to the Water Board and the general public is ongoing and continuous.

Failure to Implement Adequate Best Management Practices

128.    Since at least September 1, 2020, Defendants have failed to identify and implement adequate Best Management Practices ("BMPs") at the Facility which comply with the requirements of the General Permit.

129.    Defendants' failure to implement proper minimum BMPs is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

130.    Defendants' BMP deficiencies are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

131.    Defendants' BMP deficiencies are also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

132.    Defendants' BMP deficiencies are more particularly described in the Notice attached hereto as **Exhibit A** and incorporated herein by reference.


**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

133.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

134.    The General Permit requires Permittees to develop and implement on an ongoing basis an adequate SWPPP, including a detailed and accurate Site Map.

135.    As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the Facility.

136.    Each day since September 1, 2020, that Defendants have failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

137.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and upload to SMARTS a compliant SWPPP and Site Map.

## SECOND CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

138.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

139.    The General Permit requires Permittees to develop and implement on an ongoing basis a monitoring and reporting program that complies with all provisions of the General Permit.

140.    As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility.

141.    Each day since at least September 1, 2020, that Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

142.     These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop and implement a compliant monitoring and reporting program.

## THIRD CAUSE OF ACTION
### Submission of False Documents to the Regional Water Board/SMARTS
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

143.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

144.     Section XVI of the General Permit requires that all documents submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information. As delineated herein, Defendants made false representations in the Facility's Annual Reports and SWPPPs and has failed to correct or retract the false statements.

145.     Each time since September 1, 2020, that Defendants have made false or misleading statements in documents submitted to the Water Board via SMARTS under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act. 33 U.S.C. § 1311(a)

146.     These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' failure to withdraw any of the false and/or incomplete statements submitted to the Water Board.

## FOURTH CAUSE OF ACTION
### Failure to Implement Appropriate BMPs
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

147.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.  .

148.     As alleged herein, Defendants have failed to properly implement the required Best Management Practices ("BMPs") at the Facility.

149.    Each day since at least September 1, 2020, that Defendants have failed to implement required minimum BMPs in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

150.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and maintain adequate BMPs at the Facility.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendants to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendants to immediately operate the Sweetener Products facility in compliance with all standard conditions of the General Permit;

3.    Order Defendants to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

4.    Order Defendants to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

5.    Award such other and further relief as may be just and proper.

Dated:  October 7, 2025                      Respectfully,


By:  ___/S/_Adam D. Brumm_____
        Adam D. Brumm
        Attorney for Plaintiff

# EXHIBIT A



### EDEN

*Central Valley* **Eden Environmental Defenders**

August 5, 2025

Via US Mail, Certified and Email

Kenny Cochrane          Email:  kenny@spvw.com
Steve Shanklin                    steve@spvw.com
Facility Manager
Sweetener Products
1150 Thurman Street
Lodi, CA 95240

Via US Mail

James J Boltinghouse
Sweetener Products
Agent for Sweetener Products, Inc.
2050 East 38th Street
Vernon, CA  90058

**Re:    FIRST AMENDED 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners, Legally Responsible Persons and/or Facility Managers of Sweetener Products Co, **including the individuals Kenneth Cochrane, Steven Shanklin, David Jones, James J. Boltinghouse and Dale T. Jabour:**

This letter amends and replaces in its entirety the 60-day Notice Letter previously issued on August 13, 2024, and is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC ("EDEN") to give legal notice that EDEN intends to amend its civil action filed against against Sweetener Products, Inc., dba Sweetener Products, Sweetener Products Company, and Sweetener Products Co ("Discharger", "Sweetener" or "Sweetener Products") in US District Court for the Eastern District of California, Case No. 2:25-CV-00078-WBS-CSK to include the additional violations alleged herein and to add as additional defendants the respective corporate officers and other legally responsible parties referenced above, for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Sweetener Products facility located at 1150 Thurman Street in Lodi, California ("the Facility" or "the site").

---

1520 E. Covell Blvd #B5                    Telephone:  (800) 545-7215
Davis, CA  95616                            Email:  admin@edendefenders.org

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below. Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, duck hunting, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Sweetener Products, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous. As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Sweetener Products to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Sweetener Products under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.    THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-0028-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around March 14, 1997, Sweetener Products submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit; and on April 10, 2015, Sweetener Products reapplied for the General Permit effective July 1, 2015. Sweetener Products' assigned Waste Discharger Identification number ("WDID") is 5S39I012985.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Sweetener Products has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 Code of Federal Regulations §§122.22, 122.26; 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.    THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Sweetener Products' permanent facility address of 1150 Thurman Street in Lodi, California.

Sweetener Products is a Facility that manufactures and distributes sugar products and liquid sweeteners, according to documents on file with the Water Board. Facility operations are covered under Standard Industrial Classification Code(s) (SIC) 2064 - Candy and Confectionery Manufacturing.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 2064 , stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), and various types of oil and grease (O&G), as well as Chemical Oxygen Demand (COD), Biochemical Oxygen Demand (BOD), Iron, Zinc and Total Petroleum Hydrocarbons (TPH).

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B. The Affected Receiving Waters

The Facility discharges into the City of Lodi MS4 system, which drains to the Mokelumne River, a tributary of the San Joaquin River ("Receiving Waters").

Specifically, **Drain Inlet # 11 (DI-11)**, located at the northeast section of Sweetener's facility [east of the Loading Area portion of the main Warehouse building] is linked to an underground piping system (to which Sweetener Products claims that all or most of the facility's onsite drain inlets are connected) which is connected just north of the northeastern gate, in the middle of E. Thurman Street, to the City of Lodi's MS4 stormwater system; specifically at City of Lodi manhole **M2359**.

Stormwater entering the City of Lodi's MS4 underground stormwater piping system from this location (**M2359** at E. Thurman Street) travels north on Cluff Avenue to Turner Road, where it then continues north and northwest until it reaches **City of Lodi stormwater Outfall 1**, which discharges directly to the Mokelumne River.

Stormwater escaping the boundaries of Sweetener Products' facility enter one of two curb inlets on E. Thurman Street a short distance from the facility—either the curb inlet at the south side of E. Thurman Street at manhole **M2353** just west of Sweetener's facility; or the curb inlet at the south side of E. Thurman Street at manhole **M2453**, just east of Sweetener's facility.

Stormwater entering either City manhole **M2353** or **M2453** will reach City Outfall 1 and discharge directly to the Mokelumne River.

The Facility's Receiving Waters are impaired for Copper, Zinc, Toxicity,  Mercury, Dissolved Oxygen, Dieldrin, Diazinon, Chlorpyrifos, Group A Pesticides, Total DDT (Dichlordiphenyltrichlorethane), Total Chlordane, and PCBs (Polychlorinated biphenyls).

The Mokelumne and San Joaquin Rivers are Waters of the United States.  The CWA requires that water bodies such as the San Joaquin River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region.  The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater

Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

### III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

#### A.    *Deficient and FALSE SWPPP and Site Map*

Sweetener Products' current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map, which were certified and submitted to SMARTS on November 12, 2024, are inadequate and fails to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

Sweetener Products' prior SWPPPs and Site Maps certified and submitted to SMARTS on January 26, 2022; and August 3, 2022, are also deficient in the same manner as delineated below.

Sweetener Products' prior Site Map, certified and submitted to SMARTS on May 1, 2024, is also deficient in the manner delineated below.

1.    The Site Maps referenced above do not include all minimum required components for Site Maps as indicated in Section X.E of the General Permit as follows:

 A.  Notes, legends, and other data to ensure the map is clear, legible and understandable;

 B.  Storm water drainage areas within the Facility boundary;

 C.  Storm water flow direction of each drainage area;

 D.  At least one sampling location for every drainage area;

 E.  Sampling points which are representative of facility operations;

 F.  Municipal storm drain inlets which receive the Facility's industrial storm water discharges and authorized non-storm water discharges (IGP Section X.E.3.a);

 G.  Nearby water bodies such as rivers, lakes and creeks;

H. Locations where materials are directly exposed to precipitation; and

I. All areas of industrial activity subject to the General Permit, including industrial storage areas, storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, material and scrap storage areas ("boneyards"), waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, cooling towers, and all other areas of industrial activity that may have potential pollutant sources.

2.      The Site Maps referenced above contain **objectively false** information **intentionally certified as true and correct** by Defendant's legally responsible persons, with respect to the locations and number of storm drain inlets onsite, drainage, underground conveyance system connections, storm water flow, locations of outdoor storage and outdoor operations; and exact positions of the discharge locations and sampling points.

3.      The SWPPPs referenced above do not include all the required elements, as indicated below:

A. A complete and detailed list of all **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

B. A detailed, accurate and complete discussion of **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (Section X.G.1.a);

C. An accurate and complete description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

D. Adequate and accurate description of **Minimum Best Management Practices** (BMPs) currently implemented at the facility, including Good Housekeeping,

Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program and Quality Assurance and Record Keeping (Sections X.H.1 and X.H.4.a);

E.  A complete and accurate Pollutant Source Assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the Facility likely to come into contact with stormwater (Section XI.B.6); and

EDEN's investigation confirms that **Sulfites, Ammonia, Nitrates, Chemical Oxygen Demand (COD), Biochemical Oxygen Demand (BOD), Iron, Zinc, Volatile Organic Compounds (VOCs) and Total Petroleum Hydrocarbons (TPH) are present in industrial operations at the Facility, as well as Total Suspended Solids, Oil & Grease and pH affecting substances. The SWPPP fails to include these pollutants as additional sampling parameters, in violation of Section XI.B.6.c of the General Permit**.

EDEN's investigation into the pollutants at Sweetener's facility which are likely to commingle with stormwater includes data on file with the California Environmental Reporting Service and San Joaquin County Environmental Health Department with regard to toxic substances and chemicals located at Sweetener's facility, as well as chemicals associated with cooling towers; and with the fabrication, painting, boiler room, electrical rooms, welding and maintenance industrial processes which Defendant admits are occurring at the Facility behind roll up doors which remain open or partially open during business operating hours; and with the outdoor storage of metal, scrap metal, wood and plastic materials; and with the outdoor washing of trailers; and with Defendant's storage of industrial chemicals and other toxic substances outdoors in areas that have a roof but are otherwise open to the elements; and with the industrial process of repairing and maintaining product storage tanks, equipment and utility vehicles; and with the onsite application of pesticides; and with the engine oil, waste oils, gasoline, degreasers, lubricants, sealants, adhesives, diesel exhaust fluids, industrial coatings, transmission flud, brake fluid, coolants, antifreeze and batteries that Defendant admits are stored and handled at its facility in warehouse buildings with roll-up doors that remain open or partially open during business operating hours.

F.  An accurate and complete discussion of **Drainage Areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section X.I); and

G.  An appropriate **Monitoring Implementation Plan**, including a detailed and accurate description of all discharge locations (Section X.I);

4.    The SWPPPs referenced above also contain **objectively false information intentionally certified as true and correct by Sweetener's legally responsible persons in violation of state and federal laws**, including the following:

A.    Objectively false information with respect to the total size of the property on which Sweetener operates (e.g. the true and correct legal physical property lines), as well as the total area of the property which is used for industrial operations;

B.    Objectively false information with respect to portions of the property which Sweetener claims are non-industrial, when they are clearly industrial and subject to all terms of the General Permit;

C.    Objectively false statements that Sweetener was a member of a compliance group, when it was not;

D.    Objectively false statements that Sweetener was eligible for sampling frequency reduction, when it was not;

E.    Objectively false information with respect to the locations of industrial activities. Specifically, Sweetener's SWPPPs falsely indicate that no industrial activities occur in the vicinity of Discharge Locations 3, 4, 5,  6, 7, 8 and 9;

F.    Objectively false statements with regard to drain inlets onsite and their connections with each other, including intentional omission of several drain inlets from site maps included with versions of Sweetener's SWPPPs;

Further evidence of Sweetener's intent to falsify information in its SWPPPs and Site Maps to avoid having to collect and analyze storm water samples from all discharge locations includes Sweetener's intentional failure to date to obtain a drainage study as ordered by the Water Board to confirm the underground stormwater conveyance connections onsite;

G.    Objectively false statements with regard to the location at the facility where sampling is occurring.  Specifically, Sweetener's most recent SWPPP certified to SMARTS on November 12, 2024, indicates that storm water samples are being collected from drain inlet DI-11.  However, the Site Map included with the SWPPP clearly indicates that the sampling location is a sand trap, not a storm drain inlet;

H.    Objectively false statements with regard to industrial materials handled at its facility.  Sweetener is aware, or should be aware, that Section X.F of the General

Permit requires SWPPPs to include <u>a complete list of all materials handled at its facility.</u>  Sweetener may not lawfully pick and choose which ones to disclose to the Water Board and the General Public and which ones to obfuscate to avoid having to test its stormwater for all pollutants associated with Sweetener's industrial activities;

I.   Objectively false statements with regard to the likelihood of pollutants associated with Sweetener's industrial activities commingling with stormwater.

Sweetener has admitted that its most problematic industrial activities and processes, including painting, fabrication, welding, trailer washing, cooling tower maintenance, equipment and tank farm maintenance, boiler and electrical room maintenance, propane and other fueling activities, etc. occur either (1) outdoors fully in the open; (2) outdoors under a make-shift shelter with a roof and no sides or doors; or (3) within one of its buildings, but behind a roll-up door that stays open during operating hours.

Sweetener cannot in good faith argue that the pollutants associated with these industrial processes occur indoors and are not likely to commingle with stormwater, when that statement is nothing short of a bald-face lie.

Sweetener's contention that it does not store raw sugar materials outdoors is ludicrous, since these materials are stored in bulk amounts in huge tanks which are located outdoors.

Sweetener's excuse that its "Facility" (or the boundaries of the real property owned by Sweetener on which operations occur) includes buildings and structures which are not regulated by the General Permit is disingenuous, false, non-compliant with the standard conditions of the General Permit and is further evidence that Sweetener is fully aware that it has intentionally violated the standard conditions of the General Permit for years for nefarious reasons.

In addition, Sweetener's refusal to admit that the SWPPPs and Site Maps its legally responsible person certified and submitted to SMARTS as true and correct, *were actually true and correct* in respect to their contents at the time of submittal, is also confirmation of Sweetener's intent to falsify documents to prevent the Water Board and the General Public from discovering the plethora of pollutants Sweetener is contributing to the Mokelumne River.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

**Including objectively false information in a SWPPP or Site Map is a violation of Sections II.B.4.f, X and XXI.K, XXI.L, XXI.N and XXI.Q and is a criminal offense punishable by a $10,000 fine and a year in a federal prison.**

**Regardless of the claim of the responsible persons for Sweetener that they did not intentionally certify documents that contained false statements, these individuals admittedly possessed the requisite information to understand that they were submitting false information, as these individuals are for the most part allegedly trained members of Sweetener's Pollution Prevention Team.**

**For example, these individuals cannot truthfully argue that they were unaware of the industrial materials and chemicals present at the facility or the number and locations of drain inlets that are visible on the ground; the type and exact location of industrial processes and storage areas, and the areas of the facility where industrial operations occur, among other facts well known to all the responsible individuals.**

**This is especially true for the portions of the SWPPPs and Site Maps that were personally prepared by employees of Sweetener.**

### B. <u>Failure to Comply with Facility SWPPP</u>

The Facility's SWPPPs indicate it will collect and analyze storm water samples from two qualified storm events within the first half of each reporting year (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1 to June 30).

As detailed below, the Facility missed collecting storm water samples in the reporting years 2019-20, 2020-21, 2021-22, and 2023-24, without any valid excuse.

Sweetener cannot excuse its failure to collect the required number of stormwater samples by claiming that it qualified for a sampling frequency reduction, as at no time did Sweetener qualify for the reduction.

Section X.H.g of the General Permit requires all Dischargers to develop and implement management procedures to ensure that appropriate staff implements all elements of the Facility's SWPPP, including the Monitoring Implementation Plan.

### C. *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities.

Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. <u>Failure to Conduct Visual Observations and Maintain Required Records/Reports</u>

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

**Monthly visual observations must be conducted (a) during daylight hours; (b) during scheduled facility operating hours; and (c) on days without any precipitation.**

**Monthly visual observations must include a visual observation of <u>each drainage area</u> at the Facility, for the following: (a) the presence or indications of prior, current, or potential unauthorized NSWDs and their sources; (b) authorized NSWDs, sources, and associated BMPs to ensure compliance with Section IV.B.3; and (c) all outdoor industrial equipment and storage areas, all outdoor industrial activities areas, BMPs, and all other potential source of industrial pollutants.**

Section XI.A.3 required all Dischargers to complete contemporaneous records of all visual observations. The records at a minimum must include the date, approximate time of the observation, the locations observed, the presence and probable source of any observed pollutants, the name of the person who conducted the observation, and any response actions and/or additional SWPPP revisions necessary to be taken in response to the visual observations.

Section XXI.H provides that Dischargers must produce copies of visual observation records to regulatory agencies upon request; and Section XXI.J.5 provides that Dischargers must retain either paper or electronic copies of visual observation records for at least five (5) years.

EDEN believes that between September 1, 2019 and the present, Sweetener Products has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

Specifically, Sweetener did not conduct monthly visual observations on the following months:  February 2020 to September 2020, August 2024, October 2024 through April 2025.  Sweetener's failure to conduct the required monthly visual observations was confirmed by documents provided by Sweetener's counsel to EDEN's counsel on April 21, 2025.

In addition, Sweetener did not conduct compliant monthly visual inspections on the following months.  This information is confirmed by Sweetener's monthly visual inspection reports provided with its Initial Disclosures on April 21, 2025, and later confirmed to be genuine by Sweetener's responses to EDEN's Requests for Admission (genuineness of documents).

| Month | Issue |
|---|---|
| September 2019 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.<br><br>The date of the alleged inspection (September 1, 2019) was a Sunday.  Sweetener does not maintain regular business hours on Sundays. |
| October 2019 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| November 2019 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| December 2019 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.<br><br>Inspection Report indicates that the inspection was conducted on Deember 8, 2020, which evidences that the form was completed fraudulently years later by David Jones and provided to Sweetener's counsel.<br><br>December 8, 2019, was a Sunday.  If the inspection was alleged to have been conducted on  that date, Sweetener is not open for business on Sundays. |

| | |
|---|---|
| | The inspection was allegedly conducted at 5:30 am.  According to verified public records, it was dark at 5:30 am on Sunday, December 8, 2019.<br><br>According to verified public records, it rained at Sweetener's facility during business hours on December 8, 2019. |
| January 2020 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.<br><br>The inspection was allegedly conducted at 12:30 am on January 3, 2020.  It was dark at Sweetener's facility at that time, according to verified public records.<br><br>Furthermore, according to Sweetener's SWPPP, it is not open for business at 12:30 am, nor does it maintain regular business operating hours at that time. |
| October 2020 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| November 2020 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| December 2020 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.<br><br>The monthly visual inspection was allegedly conducted on December 31, 2020.  According to public records, it rained at Sweetener's facility that day. |
| January 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.<br><br>The monthly visual inspection for January 2021 was allegedly conducted on January 5, 2021.  According to public records, it rained at Sweetener's facility that day. |

|  |  |
|---|---|
| February 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.

The monthly inspection for February 2021 was allegedly conducted at 6:00 am on February 4, 2021, a time when it was still dark at Sweetener's facility, according to verified public records. |
| March 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| April 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.

The monthly inspection for the month of April 2021 was allegedly conducted on April 5, 2021, at 6:00 am, a time when it was still dark at Sweetener's facility, according to verified public records. |
| May 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| June 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| July 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| August 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| September 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |

|  |  |
|---|---|
| October 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| November 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| December 2021 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.

The monthly inspection for the month of December 2021 was allegedly conducted at 11:00 pm on December 23, 2021, a time when it was completely dark at Sweetener's facility, according to verified public records. |
| January 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| February 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| March 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| April 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| May 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| June 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |

| | |
|---|---|
| July 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| August 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| | The visual inspection allegedly conducted on August 24, 2022, recorded observation of sugar track-out from exiting trucks.  However, the inspection report falsely indicated that no industrial pollutants or non storm water discharges were observed during the inspection. |
| | Further, the inspection report indicated that corrective action was implemented by Sweetener on August 12, 2022, an impossibility because that would have been 12 days before the issue was observed. |
| | **Based on the foregoing, the monthly inspection report prepared by David Jones reflecting an alleged inspection on August 12, 2022, is patently fraudulent and false.** |
| September 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| | The visual inspection allegedly conducted on September 30, 2022, recorded observation of sugar track-out from exiting trucks.  However, the inspection report falsely indicated that no industrial pollutants or non storm water discharges were observed during the inspection. |
| | Further, the inspection was allegedly conducted at 6:00 am on September 30, 2022, a time when it was still dark at Sweetener's facility, according to verified public records. |
| | **Based on the foregoing, the monthly inspection report prepared by David Jones reflecting an alleged inspection on September 30, 2022, is patently fraudulent and false.** |

| | |
|---|---|
| October 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations. Drain Inlet 11 was the only location observed during the visual inspection.<br><br>Further, the inspection was allegedly conducted at 6:00 am on October 15, 2022, a time when it was still dark at Sweetener's facility, according to verified public records.<br><br>Also, October 15, 2022, was a Saturday. According to Sweetener's SWPPP, it is not open on Saturdays. |
| November 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations. Drain Inlet 11 was the only location observed during the visual inspection.<br><br>Further, the inspection was allegedly conducted at 5:30 am on November 18, 2022, a time when it was still dark at Sweetener's facility, according to verified public records. |
| December 2022 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations. Drain Inlet 11 was the only location observed during the visual inspection.<br><br>Further, the inspection was allegedly conducted at 12:00 am on December 20, 2022, a time when it was still dark at Sweetener's facility, according to verified public records.<br><br>Also, the inspection was conducted outside of Sweetener's regular operating hours, as Sweetener does not maintain regular business hours at 12:00 am on any day, according to its SWPPP. |
| January 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations. Drain Inlet 11 was the only location observed during the visual inspection. |
| February 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations. Drain Inlet 11 was the only location observed during the visual inspection. |

| | |
|---|---|
| March 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.<br><br>Further, the March 2023 inspection was allegedly conducted on March 13, 2023, a day when it rained at Sweetener's facility, according to verified public records. |
| April 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| May 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| June 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| July 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| August 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| September 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| October 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| November 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |

| December 2023 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
|---|---|
| January 2024 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.<br><br>Further, the inspection date written on the report was January 18, 2014, evidencing that the report was prepared fraudulently after the fact. |
| February 2024 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.<br><br>The inspection report for the month of February 2024 was allegedly conducted at 6:00 am on February 8, 2024, a time when it was still dark at Sweetener's facility, according to verified public records.<br><br>Further, it rained at Sweetener's facility on February 8, 2024. |
| March 2024 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection.<br><br>The inspection report for the month of March 2024 was allegedly conducted at 6:30 am on March 28, 2024, a time when it was still dark at Sweetener's facility, according to verified public records.<br><br>Further, it rained at Sweetener's facility on March 28, 2024. |
| April 2024 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| May 2024 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlet 11 was the only location observed during the visual inspection. |
| June 2024 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlets |

| | |
|---|---|
| | 10 and 11 were the only locations observed during the visual inspection. |
| July 2024 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlets 10 and 11 were the only locations observed during the visual inspection. |
| September 2024 | Failed to include a visual inspection of all industrial areas of the facility and all drainage areas and discharge locations.  Drain Inlets 10 and 11 were the only locations observed during the visual inspection. |

2.  <u>Failure to Collect and Analyze the Required Number of Storm Water Samples</u>

In addition, EDEN alleges that Sweetener Products has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, an appropriate and accurate explanation must be included in the Annual Report.

As of the date of this Notice, Sweetener Products has failed to upload into the SMARTS database system the required number of storm water run-off sample analyses for the reporting years 2019-20, 2020-21, 2021-22, and 2023-24, and has not provided either a valid or truthful explanation for its failure to do so.

Sweetener falsely claimed that there were insufficient QSEs during the 2019-20, 2020-21 and 2021-22 reporting years, when NOAA records confirm that there were sufficient QSEs. Sweetener falsely claimed during the 2023-24 reporting year that it had obtained a Sampling Frequency Reduction Certification, when in fact it had not.

3.    Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

**Collecting storm water samples on days where there has been precipitation ongoing for longer than 12 hours is a well-known trick in the industry, as these storm water samples will be naturaly diluted and not representative of the pollutants that are actually in a facility's storm water run off.**

**Sweetener has collected nearly 100% of its storm water samples from the prior four year period during times where there has been considerable amounts of rainfall for sometimes days on end.  This is another example of the Discharger's wilful intent to violate the standard conditions of the General Permit, notwithstanding that its actions are contributing to pollution in the Mokelumne River.**

Sweetener Products' stormwater runoff sample(s) collected as listed below were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date |
|-------------|
| 1/27/2021 |
| 4/19/2022 |
| 11/1/2022 |
| 11/8/2022 |
| 12/1/2022 |
| 1/18/2023 |
| 1/31/2024 |
| 11/25/2024 |
| 2/4/2025 |

4.    Failure to Deliver Storm Water Samples to a Laboratory within 48 Hours of Collection

Pursuant to General Permit Section XI.B.8, referring to Attachment H to the General Permit, Dischargers must deliver storm water runoff samples to a qualified Laboratory within 48 hours of the date and time of physical sampling.  Sweetener Products' storm water runoff samples listed below were not delivered to the Facility's Laboratory NES, Inc. in that time frame.

**Delivering collected storm water samples to laboratories later than 48-hours from collection is another well-known trick in the industry, as some of the pollutants in these**

storm water samples start to dissipate rapidly after 48 hours and are not representative of the pollutants that are actually in a facility's storm water run off.

Sweetener has delivered nearly 100% of its storm water samples from the prior four year period to its laboratory later than 48 hours after collection. This is yet another example of the Discharger's wilful intent to violate the standard conditions of the General Permit, notwithstanding that its actions are contributing to pollution in the Mokelumne River.

| Sample Date | Date/Time Laboratory Received Sample |
|---|---|
| 1/27/2021 7:00 | 2/1/2021 9:36 |
| 12/22/2021 23:00 | 12/27/2021 10:00 |
| 12/1/2022 8:00 | 12/5/2022 10:00 |
| 1/18/2023 11:45 | 1/23/2023 9:30 |
| 2/24/2023 6:00 | 2/27/2023 10:00 |
| 1/31/2024 23:15 | 2/6/2024 10:22 |
| 1/3/2025 12:20 | 1/6/2025 10:17 |
| 2/4/2025 07:00 | 2/7/2025 15:30 |
| 2/13/2025 | 2/18/2025 |

5. Failure to Collect Samples From Each Drainage Area at all Discharge Locations

Section XI.B.4 of the General Permit requires Dischargers to collect samples from all discharge locations at all drainage areas, regardless of whether the discharges are substantially similar.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location."  (Attachment C to General Permit-Glossary)  EDEN's investigation confirms that there are at least 4 drainage areas at Sweetener Products' facility.

According to Sweetener Products' SWPPPs, Site Maps and Level 1 ERA Report certified and submitted to SMARTS on December 21, 2022, the Facility has one sampling location, specified as Drain #11, but also has five separate drainage areas.

**Sweetener's Level 1 ERA Report defines the five drainage areas as follows:**

Drainage Area 1 (Drain Inlets 1 and 2)
Drainage Area 2 (Drain Inlets 3 and 4)
Drainage Area 3 (Drain Inlets 5, 6, 7, 8 and 9)
Drainage Area 4 (Drain 10)
Drainage Area 5 (Drain 11)


**The Drain Inlets specified above are depicted on the edited Site Map attached hereto.**

**EDEN's investigation confirms that there are at least 5 drainage areas and more than five discharge locations at the Facility which are not depicted on the Site Map, nor are they discussed in the SWPPP, including storm water discharges emanating from the boundaries of the facility via sheet flow to the southeast railroad tracks, southwest onto the adjacent property, and out the northwest entrance gate.**

**Furthermore, EDEN alleges that there are in fact multiple separate underground conveyance systems at the facility that do not connect. Storm water samples should be collected at multiple drain inlets as shown on the attached edited site map. This determination cannot be made without a professional drainage study.**

**Sweetener has falsified its SWPPPs and Site Maps to avoid collecting storm water samples at these locations, due to the high amount of pollutants in the areas of the discharge locations, which are generated by Sweetener's undisclosed industrial processes which are occurring effectively outdoors.**

The storm water runoff sample analyses Sweetener Products uploaded for samples collected on the dates listed below failed to include samples from all discharge locations at the Facility:

| |
|---|
| 1/27/2021 |
| 2/2/2021 |
| 12/22/2021 |
| 4/19/2022 |
| 11/1/2022 |
| 11/8/2022 |
| 12/1/2022 |
| 1/18/2023 |
| 2/24/2023 |
| 12/18/2023 |

| |
|---|
| 1/31/2024 |
| 11/25/2024 |
| 1/3/2025 |
| 2/4/2025 |
| 2/13/2025 |
| 3/12/2025 |

6. <u>Failure to Analyze Storm Water Samples for All Required Parameters</u>

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type:  pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.

Sweetener Products' SWPPP includes Chemical Oxygen Demand (COD) as a mandatory sampling parameter, based on the Pollutant Source Assessment contained in the SWPPP.

EDEN's investigation confirms that the following additional parameters must be included in the Facility's sampling process, as they are associated with Sweetener Products' industrial operations as discussed above.  Again, Sweetener has intentionally omitted these pollutants from its required pollutant source assessment in its SWPPPs to avoid having to test its storm water for the following constituents:

**Sulfites, Ammonia, Nitrates, Chemical Oxygen Demand (COD), Biochemical Oxygen Demand (BOD), Iron, Zinc, Volatile Organic Compounds (VOCs) and Total Petroleum Hydrocarbons (TPH)**

Section XI.B.6.e of the General Permit requires Dischargers to analyze for any additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix. Test methods with lower detection limits may be necessary when discharging to receiving waters with 303(d) listed impairments or TMDLs.

The storm water runoff sample analyses Sweetener Products uploaded for samples collected on the dates listed below failed to include all required additional sampling parameters as outlined above.

| |
|---|
| 1/27/2021 |
| 2/2/2021 |
| 12/22/2021 |
| 4/19/2022 |
| 11/1/2022 |
| 11/8/2022 |
| 12/1/2022 |
| 1/18/2023 |
| 2/24/2023 |
| 12/18/2023 |
| 1/31/2024 |
| 11/25/2024 |
| 1/3/2025 |
| 2/4/2025 |
| 2/13/2025 |
| 3/12/2025 |

**D.   _False Documents Certified and Submitted via SMARTS_**

Section XXI.L of the General Permit provides as follows:

**L. Certification**

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Pursuant to Section XXI.N of the General Permit:

*Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both.*

1. **False Annual Reports**

Sweetener Products has failed to comply with Sections XVI.A, XXI.L and XXI.N of the General Permit by failing to submit complete and accurate Annual Report(s) to the Regional Water Board for the reporting year(s) 2019-20, 2020-21, 2021-22, 2022-23, 2023-24 and 2024-25.

(a) **False Statements Relating to Failure to Collect Storm Water Samples**

i. **False Statements of Insufficient Rainfall and QSEs**

Sweetener's Annual Report(s) for the 2019-20, 2020-21 and 2021-22 reporting years included Attachment 1 as an explanation for why Sweetener Products failed to collect and analyze stormwater run-off during the required number of Qualifying Storm Events during the applicable reporting year(s) for all discharge locations, in accordance with Section XI.B.

Kenneth Cochrane and Steve Shanklin certified in the Report(s), under penalty of perjury, that the required number of stormwater samples were not collected by the Facility because [allegedly] there were insufficient qualifying storm water discharges during the reporting year(s) and scheduled facility operating hours.

However, records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years in question there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Sweetener Products to have collected the requisite number of samples.

Specifically, Sweetener did not collect *any* storm water samples during the reporting year 2019-20.  Kenneth Cochrane made an objectively false statement when he certified Sweetener's Annual Report on June 15, 2020, for the 2019-20 reporting year and claimed that there were no qualifying storm events at any time during business hours during the reporting period.

**NOAA records indicate that there was a total of nearly 10 inches of rainfall during the year, including 14 qualified storm events. Other permitted facilities in Lodi had no problem collecting storm water samples during the 2019-20 reporting year.**

**During the 2024-25 reporting year, Sweetener collected five storm water samples. NOAA records for the 2024-25 reporting year confirm that there were also 14 qualified storm events during business hours. It is important to note that Sweetener's business hours are extended beyond the average business in the area. The facility operates Monday through Friday, 2:30am-6:30pm, according to Sweetener's SWPPP.**

**Sweetener's sampling history confirms that discharge occurs even during days with a low amount of rainfall, such as .04" of rain occurring in a 24-hour period. In addition, Sweetener's sampling history also indicates that sampling has occurred as early as 5:00 am, and as late at 6:30 pm. Finally, Sweetener has designated multiple individuals at the facility who are allegedly trained to collect storm water samples.**

**During the 2020-21 reporting year, Sweetener only collected two storm water samples. On June 22, 2021, Steven Shanklin certified in Sweetener's 2020-21 Annual Report that there were no QSEs in the first half of the year. NOAA records indicate that there were in fact at least three QSEs during the first half of the year.**

**During the 2021-22 reporting year, Sweetener only collected two storm water samples. On July 7, 2022, Kenneth Cochrane certified in Sweetener's 2021-22 Annual Report that there were insufficient QSEs during the year. NOAA records indicate that there were at least nine QSEs.**

    ii.    <u>False Statement re: Sampling Frequency and SFR Certification</u>

Kenneth Cochrane certified in the Facility's 2023-24 Annual Report submitted to SMARTS on June 5, 2024, that the Facility had sampled the required number of Qualifying Storm Events during the reporting year for all discharge locations (in accordance with Section XI.B). However, during the 2023-24 reporting year, the facility actually collected and analyzed only two storm water samples.

**Mr. Cochrane falsely claimed in the facility's 2023-24 Annual Report that Sweetener had a Sampling Frequency Reduction (SFR) certification. However, as of June 5, 2024, Sweetener had not obtained a SFR and in fact did not qualify for one.**

Pursuant to Section XI.C.7 of the General Permit, a Discharger is not eligible for a SFR if it is not in full compliance with the General Permit and has not updated, certified and submitted via SMARTS all documents, data and reports required by the General Permit.

Section XI.C.7.d further provides that the Discharger may not reduce the sampling frequency until it has certified and submitted to SMARTS a Sampling Frequency Reduction Certification form.

As detailed herein, Sweetener was not in full compliance with the General Permit as of June 5, 2024.  More importantly, Sweetener did not certify and submit to SMARTS its Sampling Frequency Reduction Certification until September 13, 2024, after it received EDEN's initial notice letter on August 13, 2024.

**Mr. Cochrane is an allegedly trained member of Sweetener's Pollution Prevention Team and knew or should have known that a Discharger is not eligible to claim a Sampling Frequency Reduction prior to the date of certification and submittal of the SFR Certification form to SMARTS.**

**(b) <u>False Statements re: Monthly Visual Observations</u>**

<u>2020-21 Reporting Year</u>

**On June 22, 2021, Steven Shanklin certified in Sweetener's 2020-21 Annual Report that monthly observations had been conducted every month during the reporting period. This statement was objectively false at the time of certification.**

**Mr. Shanklin, as Sweetener's VP of Operations and Legally Responsible Person for purposes of General Permit compliance, knew or should have known that monthly visual observations were not conducted for the months of August and September of 2020 because no visual observation reports were available during those months.**

The missing observation reports were confirmed through documents provided by Sweetener's counsel with Sweetener's Initial Disclosures on April 21, 2025.

Any attempt by Sweetener to produce monthly visual observation forms prepared after the fact to avoid liability for this violation will not suffice to moot the violation.

<u>2024-25 Reporting Year</u>

**On June 19, 2025, Kenneth Cochrane certified in Sweetener's 2024-25 Annual Report that monthly observations had been conducted every month during the reporting period.  This statement was objectively false at the time of certification.**

**Mr. Cochrane as Sweetener's Plant Manager knew or should have known that monthly visual observations were not conducted for the months of August 2024, October**

**2024, November 2024, December 2024, January 2025, February 2025, March 2025 and April 2025 because no visual observation reports were available during those months.**

The missing observation reports were confirmed through documents provided by Sweetener's counsel with Sweetener's Initial Disclosures on April 21, 2025.

Any attempt by Sweetener to produce monthly visual observation forms prepared after the fact to avoid liability for this violation will not suffice to moot the violation.

### (c)  False Statements Re: Discharge Locations

Kenneth Cochrane certified in Sweeneter's Annual Reports for the reporting years 2019-20 (certified June 15, 2020), 2021-22 (certified on July 7, 2022), 2023-24 (certified on June 5, 2024) and 2024-25 (certified on June 19, 2025); and Steven Shanklin certified in Sweetener's Annual Reports for the reporting years 2020-21 (certified on June 22, 2021) and 2022-23 (certified on June 13, 2023) that there is only one discharge location at Sweetener's facility.

This statement made under penalty of law (perjury) by both Mr. Cochrane and Mr. Shanklin was objectively false at the time that it was made.  Both Mr. Cochrane and Mr. Shanklin are members of Sweetener's Pollution Prevention Team and have personal knowledge that there are at least five discharge locations at Sweetener's facility.

SMARTS maintains metadata that includes the SMARTS username, certifier name, certifier password hash, IP address of the computer used to certify each document, the exact date and time of certification, as well as other information.

According to records obtained by EDEN, on December 21, 2022, at 12:49 pm, Kenneth Cochrane certified Sweetener's Level 1 ERA report for 2022-23, addressing Sweetener's exceedances of Chemical Oxygen Demand (a receiving water impairment pollutant).  The Report was certified by Mr. Cochrane from a computer with an IP address of 198.143.33.25.

The Level 1 ERA report that was **personally certified as true and correct by Mr. Cochrane,** who is Sweetener's Plant Manager, confirmed in Section 3.0 – Drainage Area Descriptions, that there are five drainage areas at the facility, with at least five separate and distinct discharge locations, including Drain Inlets 1 through 11.

### (d) False Statements regarding the presence of Zinc

EDEN's investigation has confirmed that Zinc is present at Sweetener's facility:  (1) through the egregious amount of tire tracking confirmed to be at the facility; and (2) as an primary ingredient of the painting materials and other chemicals utilized at the facility which are exposed to stormwater.

Zinc is a receiving water impairment for Sweetener's receiving waters. Thus, Sweetener is required to both disclose its presence on each Annual Report and to test its stormwater for Zinc.

The Annual Reports certified by Kenneth Cochrane and Steven Shanklin for the reporting periods 2019-20, 2020-21, 2021-22, 2022-23, 2023-24 and 2024-25 all falsely and fraudulently certified that Zinc was not present at Sweetener's facility.

## 2.   **False Statements Contained in the NOI Application for IGP Coverage**

On April 10, 2015, Steven Shanklin certified and submitted to SMARTS Sweetener's Notice of Intent to Discharge Stormwater Associated with Industrial Activity (NOI-Application for General Permit coverage).

Mr. Shanklin falsely certified in this document that the industrial area at the facility exposed to storm water was only one acre.

At the time that Mr. Shanklin made this cerification, he knew that it was false. Mr. Shanklin as the Vice President of Operations for Sweetener's facility, is fully aware that industrial operations are occurring in the majority of the 12-acre parcel on which Sweetener operates.

While EDEN does not currently have an exact figure which represents the true area of industrial operations, it estimates the area to be at least eight acres. EDEN will be confirming this through a scheduled site visit, as well as by expert opinions.

## 3.   **False Statements Contained in Sweetener's SWPPP and Site Maps**

On January 26, 2022, at 12:30 pm, Kenneth Cochrane certified Sweetener's revised SWPPP and Site Map to be entirely true and correct under penalty of perjury. Mr. Cochrane personally made this certification from a computer with an IP address of 198.143.33.19.

On August 3, 2022, at 3:21 pm, Steven Shanklin certified Sweetener's revised SWPPP and Site Map to be entirely true and correct under penalty of perjury. Mr. Shanklin personally made this certification from a computer with an IP address of 198.143.33.28.

On November 12, 2024, at 1:12 pm, Kenneth Cochrane certified Sweetener's revised SWPPP and Site Map to be entirely true and correct under penalty of perjury. Mr. Cochrane personally made this certification from a computer with an IP address of 198.143.33.27.

The specific false statements made by by Mr. Cochrane and Mr. Shanklin in Sweetener's SWPPPs and Site Maps are detailed in Section III.A above.

**4.    False Statements Included in Sweetener's Level 1 ERA Report**

As detailed in Section III.D.1.c above, Kenneth Cochrane made false statements in Sweetener's Level 1 ERA report which he personally certified as true and correct under penalty of law and submitted to SMARTS on December 21, 2022.

### E.  *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Sweetener Products has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges. Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Sweetener Products' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

*Specific BMP Deficiencies*

Sweetener's BMP deficiencies have been verified by Level 1 ERA Reports certified and submitted to SMARTS by Sweetener, Inspection Reports uploaded to SMARTS by the Water Board, and publicly available satellite images, for the following dates:

March 29, 2016

On March 29, 2016, Water Board inspector R. Ditto inspected Sweetener's facility with Kenneth Cochrane.

During the inspection, Mr. Ditto noted that a tanker was parked in the northwest portion of the facility and was leaking sugar water onto the concrete near a storm drain.

Mr. Ditto also confirmed that none of Sweetener's drain inlets had any drain inlet protection implemented and futher that the storm drain to the east of the inside loading area had a

dark stain leading into it.  Excessive tracking of sugar products was also confirmed during the inspection.

Mr. Ditto verbally instructed Mr. Cochrane at the time of the inspection, and followed up with the verbal instruction in a written report and transmittal letter, requesting that Sweetener verify the discharge locations and underground connections at the facility to ensure that Sweetener was sampling from the correction locations.

To date, Sweetener has refused to do so and has not provided the Water Board or the General Public with any verification of its false claims relating to underground storm water conveyance systems and connections, or accurate discharge locations.

<u>August 14, 2017</u>

On August 14, 2017, the facility was inspected by Jason Wunschel of NES, Inc., pursuant to Exceedance Response Action requirements of the General Permit.  The Level 1 ERA report certified by Sweetener on November 16, 2017, indicated the following BMP deficiencies:

- Significant tracking of sugar observed from the main building exit;
- Sugar buildup and staining observed in dry product transfer area;
- Heavy staining and buildup of sugar residue across the truck scale and around the scale to the property gate, tracking observed going out onto Thurman Street; and
- Sporadic staining throughout property in trailer parking areas (oil and vehicle fluids).

<u>July 21, 2022</u>

On July 21, 2022, Sweetener was again inspected by Jason Wunschel of NES, Inc, who confirmed the following BMP deficiencies:

- Sugar buildup and staining in dry product transfer areas;
- Sporadic staining throughout property in trailer parking areas;
- Significant track out from the indoor manufacturing and loading areas;
- Heavy staining and buildup of sugar residue across the scale and leading from the scale to the property exit gate.  Track out observed onto Thurman Street.
- Track out observed from the main building exit, which introduced sugar product into the storm water drainage area directly upslope from Drain Inlet 11
- Track out of sugar observed from the indoor manufacturing and loading area leading into the D11 drainage area.

EDEN's investigation confirms that some or all of the aforementioned BMP deficiencies are continuing to occur at the Facility. Specifically, EDEN has recently observed the facility and obtained evidence of the following ongoing BMP deficiencies:

- Extensive tire tracking on facility's paved areas;
- Vehicle fluid observed discharging into storm drain from East Covered Loading area;
- Tank leaks and staining observed south of facility;
- Vehicle fluid leaks observed west of the facility from parked trucks;
- Uncovered waste bins;
- Rollup doors left opened at warehouse, shop, manufacturing, and plant building;
- Finished product spilled on ground surrounding waste dumpster outside manufacturing building;
- Sugar material tracking observed leaving the main production building;
- No BMPs to address vehicle leaks and railway car pollution;
- No BMPs to mitigate off-site discharge via sheetflow at the entrance gates and other discharge locations; and
- No BMPs to protect drain inlets.

EDEN's review of publicly available satellite images confirms that the aforementioned BMP deficiencies are continuing to occur at the Facility.

### F. _Discharges In Violation of the General Permit_

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

1.  <u>Discharges in Excess of Technology-Based Effluent Limitations</u>

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  (General Permit, Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit.  The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (General Permit, Section I.M. (Finding 62)).

Sweetener Products' exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit.   EDEN alleges and notifies Sweetener Products that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

Sweetener Products' ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility.  EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

Sweetener Products' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

    2.   <u>Discharges in Excess of Receiving Water Limitations</u>

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations. Receiving Water Limitations found in Section VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan. Exceedances of WQS are violations of the Industrial General Permit, the CTR, the Basin Plan, any parameter included as an impairment for the Facility's Receiving Waters on the 303(d) listing, and any parameters identified by the Regional Water Board as parameters assigned a total maximum daily load (TMDL).

Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan. (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the San Joaquin River and its tributaries, including but not limited to the following:

• Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

• Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

• Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

•   All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

• Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below. These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters. Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health. These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

Further, EDEN puts Sweetener Products on notice that the Receiving Water Limitations are independent requirements that must be complied with, and that carrying out the process triggered by exceedances of the NALs listed at Table 2 of the General Permit does not amount to compliance with the Receiving Water Limitations. The NALs do not represent water quality-based criteria relevant to determining whether an industrial facility has caused or contributed to an exceedance of a WQS, or whether it is causing adverse impacts to human health or the environment.

Section XX.B of the General Permit provides that when a facility's industrial storm water discharges and/or authorized NSWDs are determined to contain pollutants that are in violation of Receiving Water Limitations contained in Section VI, the Discharger must conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented, assess its current SWPPP, and certify via SMARTS any additional BMPs identified which are necessary in order to meet the Receiving Water Limitations.

EDEN alleges that from at least September 1, 2019, to the present, Sweetener Products has been in violation of the Receiving Water Limitations provision of Section VI of the General Permit, as evidenced by its exceedances of the applicable Water Quality Standards set forth in the Regional Basin Plan, indicated below.

Specifically, Sweetener Products' sample analyses summarized below violate the strict numeric effluent limitations (NELs) established for San Joaquin River and Mokelumne River.

Further, Sweetener Products has failed to comply with Section XX.B of the General Permit. Failure to comply with the additional Water Quality-Based Corrective Action requirements listed in Section XX.B is an additional violation of the General Permit.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions of the General Permit and are evidence of ongoing violations of Effluent Limitations.

**EDEN notes that during the 2024-25 reporting year, Sweetener collected five storm water samples in an unsuccessful attempt to avoid an average annual exceedance of TSS.**

**The following data was derived entirely from documents certified and submitted to SMARTS by Sweetener.**

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| | | | |
| 2/2/2021 | Drain #11 | COD | 29.00 |
| 4/19/2022 | Drain #11 | COD | 300.00 |
| 1/3/2025 | Drain #11 | TSS | 580.00 |

**\***All units are listed in milligrams per liter (mg/L), except pH, which is listed in pH units (SU)

Listed below are the EPA Benchmark numeric action levels associated with the parameters, as identified on **Table 2 of the General Permit,** as well as the Maximum Contaminant Levels (MCLs) listed in the **California Code of Regulations, Title 22, Section 64431** (Table 64431-A) and the Water Quality Control Plan **(Basin Plan)** for the **California Regional Water Quality Control Board, Central Valley Regional, Fifth Edition** (Revised May 2018), Basin Plan Table 3-1, Trace Element Water Quality Objectives.

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| pH | N/A | >6 or <9 SU | >6.5 or >8.5 | N/A |
| Total Suspended Solids (TSS) | 100 mg/L | 400 mg/L | N/A | N/A |
| Oil & Grease | 15 mg/L | 25 mg/L | N/A | N/A |
| Zinc | .26 mg/L | N/A | .10 mg/L | N/A |
| Copper | .0332 mg/L | N/A | .0056 mg/L | N/A |
| Lead | .262 mg/L | N/A | N/A | .05 mg/L |
| Chemical Oxygen Demand (COD) | 120 mg/L | N/A | N/A | N/A |
| Biochemical Oxygen Demand (BOD) | 30 mg/L | N/A | N/A | N/A |
| Aluminum | .75 mg/L | N/A | N/A | 1.0 mg/L |
| Iron | 1.0 mg/L | N/A | .30 mg/L | N/A |
| Nitrate + Nitrate Nitrogen | .68 mg/L | N/A | N/A | 45 mg/L |
| Phosphorus | 2.0 mg/L | N/A | N/A | N/A |

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| Ammonia | 2.14 mg/L | N/A | N/A | N/A |
| Magnesium | .064 mg/L | N/A | N/A | N/A |
| Arsenic | .064 mg/L | N/A | N/A | N/A |
| Cadmium | .0053 mg/L | N/A | .00022 mg/L | .01 mg/L9i |
| Nickel | 1.02 mg/L | N/A | N/A | N/A |
| Mercury | .0014 mg/L | N/A | N/A | N/A |
| Selenium | .005 mg/L | N/A | N/A | N/A |
| Silver | .0183 mg/L | N/A | .01 mg/L | .05 mg/L |

### G.  Failure to Comply with Exceedance Response Action Requirements

As of July 1, 2015, the date the current General Permit became effective, all Dischargers were in "Baseline status" for all parameters listed in Table 2 of the Permit.   (General Permit, Section XII.B.

Pursuant to Section XII.C of the General Permit, a Discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate either an annual average or instantaneous Numeric Action Level ("NAL") exceedance for that same parameter.

Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the Discharger enters the Exceedance Response Action ("ERA") process.  The ERA process requires the Discharger to conduct a Level 1 ERA Evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s), and to do so by October 1 following commencement of Level 1 status.

The Level 1 ERA Evaluation must include the identification of the corresponding BMPs in the SWPPP, as well as any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.  Furthermore, the Evaluation must include all drainage areas at the facility.

Based upon the Level 1 ERA Evaluation, the Discharger is required to, as soon as practicable, but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report.  (Section XII.C.2).  The Level 1 Report must be prepared by a QISP and must include a summary of the Level 1 ERA Evaluation, a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL.

The SWPPP revisions and additional BMP development and implementation must also be completed by January 1.  The Level 1 status discharger is required to submit via SMARTs the Level 1 ERA Report certifying that the Level 1 ERA Evaluation has been conducted, and necessary SWPPP revisions and BMP implementation has been completed.  The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address).

A Discharger's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.

**Deficient and False Level 1 ERA Report**

Based on the test results summarized above, Sweetener Products was elevated to Level 1 Status for Chemical Oxygen Demand on July 1, 2022, pursuant to Section XII.C – Exceedance Response Actions of the General Permit.

Sweetener Products certified and submitted to SMARTS a Level 1 ERA Report on December 21, 2022.  However, the Level 1 ERA Report does not comport with the requirements of Section XII.C of the General Permit.

The Level 1 ERA Report fails to include an adequate analysis of all pollutant sources that are or may be related to the NAL exceedance.

Specifically, the Report fails to include an adequate evaluation of all five drainage areas af the facility, and omits identification of areas with potential off-site sheet flow, including the northwestern gate entrance, the southwest adjacent property, and the southeastern railroad tracks..

In addition, the report falsely indicates that Drainage Area 1 (Drains 1 and 2) and Drainage Area 3 (Drains 5, 6, 7, 8 and 9) are non-industrial; and falslely indicates that all drain inlets in all five drainage areas are connected.

Based on the foregoing, Sweetener Products has failed and continues to fail to conduct an adequate Level 1 status evaluation and has also failed to submit a Level 1 ERA Report that complies with the General Permit.  As such, Sweetener Products is in daily violation of the General Permit.

### H.  _Failure to Properly Train Employees/Facility Pollution Prevention Team_

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Sweetener Products has failed to comply with numerous standard conditions of the General Permit as outlined above and has failed to retain a QISP to trains its Pollution Prevention Team after entering Level 1 status, in violation of General Permit Section XII.

Based on the foregoing violations, it is clear that Sweetener Products has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Sweetener Products may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

### IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Sweetener Products Sweetener Products, Inc., dba Sweetener Products, Sweetener Products Company, and Sweetener Products Co., as well as **Steven Shanklin, Kenneth Cochrane, David Jones, James J. Boltinghouse and Dale T. Jabour.**

### V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is September 1, 2019, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

The attorney assigned to this matter is:

Adam D. Brumm, Esq.
Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215, extension 906
Email:  adam@edendefenders.org

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of <u>$57,617.00 per day, for each violation occurring on or after November 2, 2015</u>.**

In addition to civil penalties, EDEN is seeking injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

60-Day Notice of Intent to Sue
Sweetener Products
August 5, 2025
Page 42 of 42

Lastly, pursuant to 33 U.S.C. § 1365(d), EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Lee M. Zeldin, Director, U.S. Environmental Protection Agency, zeldin.lee@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov
Javier Orozco, State Water Resources Control Board, Javier.orozco@waterboards.ca.gov

Counsel for Plaintiff and Defendant

